UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.   **08-20636-CIV-UNGARO/O'SULLIVAN**

WILLIAM CRAIG CAMPBELL,
Plaintiff/Petitioner

v.

UNITED STATES BUREAU OF PRISONS and
JORGE PASTRANA, WARDEN, FEDERAL CORRECTIONAL
INSTITUTION, SATELLITE CAMP, MIAMI, FLORIDA
Defendant/Respondent.

_____/

FILED by ___ *JC* ___ D.C.
ELECTRONIC

**MAR. 11, 2008**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## PETITIONER'S PETITION FOR
## WRIT OF HABEAS CORPUS FILED PURSUANT TO 28 U.S.C. § 2241 and
## MEMORANDUM OF LAW

COMES NOW the Defendant, WILLIAM CRAIG CAMPBELL, by and

through his undersigned attorney, PATRICIA JEAN KYLE, ESQ., who

respectfully Petitions this Honorable Court pursuant to Title 28 United States

Code Section 2241 for an Order releasing inmate WILLIAM CAMPBELL from

custody by and jurisdiction of the United States Bureau of Prisons' Federal

Correctional Facility, Satellite Camp, located at Miami/Homestead, Florida back

into the Halfway House program from whence he was abducted.  Undersigned

counsel also requests that the Court grant her an additional 30 days within which

to gather additional supporting documents and within which to prepare and submit

a complete Memorandum of Fact and Law. In support, WILLIAM CAMPBELL

sets forth as follows:

1

## JURISDICTION

Mr. Campbell is in the "custody" of the Bureau of Prisons as the term is set forth in 28 U.S.C. § 2241(c)(1).  Habeas Corpus is proper in the United States District Court for the Southern District of Florida under 28 U.S.C. § 2241(d) because Mr. Campbell is located in the Southern District of Florida within the custody of the Bureau of Prisons and presently is housed at the Federal Correctional Institution, Satellite Camp, Miami/Homestead, Florida.

## BACKGROUND

After having served his sentence and having been released into a Halfway House where he had been for approximately three months, upon the instigation of the United States Attorney's Office in Atlanta, **Mr. Campbell was (1) forced to participate in an eligibility review for a substance abuse program he <u>already had completed successfully</u>; (2) was forced to participate (a) without knowing the charges, (b) without counsel, (c) under duress and (d) believing that, in light of the behavior of the BOP inquisitor, his limited liberty was in jeopardy, (e) without anyone in a position of authority speaking to Mr. Campbell's outpatient counselor and (f) without due consideration to the decisions already made by no less than a BOP officer who is the NATIONAL Drug Abuse Program Coordinator.**  The purported "eligibility review" was a sham as there was no consultation with Mr. Campbell's outpatient counselor, the RDAP Program counselors or the physicians who had treated Mr. Campbell.

2

## FACTS and RECENT EVENTS

On Wednesday, March 5, 2008, approximately 14 months after a determination was made by the **National** Director of the RDAP Program, Ms. Beth A. Weinman, that Mr. Campbell was eligible for participation in the "Substance Abuse Program" (See, Exhibit A), and three months after Mr. Campbell successfully completed that program (see, Exhibits B), the Bureau of Prisons revoked Mr. Campbell's Halfway House confinement and, <u>without providing him with (1) a reason for the revocation, (2) due process, (3) counsel, (4) the right to confrontation and/or (5) an opportunity to review, investigate or respond to the [unknown] "charges,"</u> Mr. Campbell was taken summarily, and without explanation, by United States Marshals and re-incarcerated at the FCI, Miami. The only thing that is known by undersigned counsel and Mr. Campbell is that his re-incarceration supposedly is owing to "new information" received from the United States Attorney's Office in Atlanta, Georgia.

For the past three months, until he was seized by the BOP and returned to the FCI, Mr. Campbell had been in a Halfway House, successfully and beneficially participating in the Aftercare Program. The first hint to Mr. Campbell that *something was up* came just a few days ago when (**after completion of the RDAP Program and while in Aftercare**) Mr. Campbell was told by BOP employee Dr. C. Lohman, who came at Government and taxpayer expense from Atlanta, without notice, that there was to be a "review regarding his eligibility" to participate in the RDAP Program. After questioning Dr. Lohman regarding the

3

appropriateness of the review since he already had completed the RDAP Program, Mr. Campbell asked to have his counsel present for the review interview. That request was denied, and Mr. Campbell was forced to participate, under duress, without counsel, without being advised of any allegations of wrongdoing and believing that his limited liberty was in jeopardy.

Mr. Campbell has been undergoing outpatient counseling as part of his aftercare treatment for almost three months, and he has had substantial benefit working with his outpatient counselor, Ms. Elise Powell. Mr. Campbell's participation in the aftercare program was interrupted, with substantial impact to his continued wellbeing, when he was seized by the United States Marshals. In fact, as demonstrated in Ms. Powell's letter of March 5, 2008 (See, Composite Exhibit C), all previous considerations of Mr. Campbell's eligibility for the RDAP Program clearly showed that Mr. Campbell "meets the criteria for alcohol dependence." In addition, Ms. Powell stated that this conclusion "was verified by the results of our psychosocial assessment." Further, Mr. Campbell's participation in the aftercare program was active, and he "participated with all treatment recommendations." Mr. Campbell was "responsible, compliant, and has attended all scheduled appointments. He is actively focused on his sobriety." Ms. Powell concluded:

> I have been working with clients who have substance abuse problems for the last ten years. In my professional experience, clients who are actively working on their sobriety need to remain in treatment until goals have been met. I feel Mr. Campbell is greatly benefiting from TDAT program. It is my experience that clients who admit they have

4

an alcohol problem need to remain in treatment until I professionally feel he will not relapse.

So, what happened here?   After an *eight (8) year* investigation, Mr. Campbell, the former Mayor of the City of Atlanta, was charged by the Atlanta office of the United States Attorney with, among other charges, RICO acts and relatively minor tax violations involving the failure to file on approximately $60,000 of apparent unreported gambling winnings. To the embarrassment of the United States Attorney's Office, a jury found Mr. Campbell "not guilty" of all charges but the minor tax counts. In what only can be considered a vindictive move, the United States Attorney's Office fought for and obtained an inordinately high sentence—Mr. Campbell was sentenced to 30 months incarceration. The PreSentence Investigation Report said nothing about Mr. Campbell's alcohol addiction, a fact that was ascertainable easily to the Government and to the Probation Office (which never asked the Petitioner about his alcohol consumption) owing, in part, to the testimony during trial of Dewey Clark that he frequently purchased large quantities of bottles of champagne for Mr. Campbell over a period of time. While it is true that Mr. Campbell's trial attorney claimed in a Sentencing Memorandum that Mr. Campbell did not have a substance abuse problem, he apparently did so on the "sentencing argument theory" that if there was no substance abuse problem, the Defendant therefore did not require the limited resources of the BOP, and therefore the Court did not need to waste those resources on him by **confining** Mr. Campbell.  Clearly, Mr. Campbell knew he

5

had an alcohol problem, and there must have been some confusion between Mr. Campbell and his attorney regarding the issue since his attorney raised the issue in the Sentencing Memorandum but never argued it at sentencing. Mr. Campbell never lied about the issue that was something he was addressing very privately until he came to prison. At the time of trial and sentencing, Mr. Campbell was so humiliated by the media circus surrounding his trial that he was not anxious then to provide further fuel for the media fire—even had he thought about it at that time. In addition, Mr. Campbell's alcohol abuse increased prior to and during trial when he became unusually stressed by the death of his mother, the costs associated with his defense, the spurious serious charges made against him by the Government and the media attention to him, his wife and their two children. It is clear from the facts in this case, including Mr. Campbell's prior efforts to seek assistance from physicians in Tallahassee, Florida and Atlanta, Georgia, and Mr. Campbell will admit, that he abused alcohol even before the indictment in his case and simply was unable to accept that his alcohol consumption was a real problem or to announce to the media and his family the existence of one more personal failure. His position of being in self-denial regarding his alcohol abuse lasted until he was incarcerated and no longer had access to the alcohol with which he had self-medicated personal stress resulting from the investigation, trial, media pressure and family tragedies.

After the imposition of sentence, Mr. Campbell surrendered to the designated institution. Shortly thereafter, recognizing his alcohol abuse problems

6

and wanting to use the time of his incarceration to improve the future quality of his life and the lives of those he loved, Mr. Campbell sought treatment through the RDAP Program, and he was admitted to that Program based on a Memorandum from Beth Weinman, the BOP's <u>National</u> Drug Abuse Program Coordinator (see, Exhibit A). Ms. Weinman had before her clinical and medical evaluations, documented diagnoses of Mr. Campbell's alcohol abuse, *before* she permitted Mr. Campbell to enter into the Program. Clearly, Mr. Campbell's admission into the Program was not based on any *technicality*, as the Government may contend, but Ms. Weinman based her decision, in part, on treatment notes from two separate physicians, in two separate cities, at two separate times who did not know each other but who each had seen Mr. Campbell regarding his substance abuse problems <u>before the trial</u> and, in one case, <u>before the indictment</u>.

Following his successful completion of the RDAP Program, when Mr. Campbell was released from the Program, two BOP employees, Stephanie Hamilton and Charisse Garcia, both diagnosed Mr. Campbell as being "alcohol dependent." (See, Exhibit D). *Ergo*, in light of those diagnoses, Mr. Campbell was referred to the Aftercare Program during his time at the Halfway House, and he is required to participate in substance abuse "until I [Elise Powell] professionally feel he will not relapse." (See, Exhibit C).

There simply is nothing new with any of these procedures, and nothing improper has been done by Mr. Campbell, or anyone on his behalf, with regard to Mr. Campbell's alcohol abuse treatment. What has happened here is that the

7

Office of the United States Attorney in Atlanta, in a well-chronicled act of animosity toward Mr. Campbell, decided to exercise vengeance when it realized, too late, that Mr. Campbell would receive a *de facto* procedurally based reduction of sentence for successfully completing the RDAP Program and any recommended aftercare programs. In a most astonishing and revealing irregularity, BOP Atlanta inquisitor, Dr. C. Lohman, arrived in Miami on a "surprise visit" and told Mr. Campbell that he was there to clear things up "because questions had been raised by the U.S. Attorney's Office in Atlanta about [Mr. Campbell's] eligibility for the RDAP Program. Mr. Campbell asked to have his attorney present; he "objected to the entire process;" he was told he had to "speak to Ms. Dennings from Atlanta [who] directed [Mr. Campbell] to conduct the interview even though [he] objected and wanted [his] attorney present" and he was told by Ms. Dennings that if he refused to participate in the interview, he would be re-incarcerated. (See, Composite Exhibit E, including notes from BOP employee Ms. Erica Gavin). Dr. Lohman completely misled Mr. Campbell regarding the ultimate purpose of his visit. After spending a very short period of time with Mr. Campbell, under conditions where Mr. Campbell was *(1) forced to participate in an eligibility review for an abuse program he <u>already had completed successfully</u>; (2) was forced to participate (a) without knowing the charges, (b) without counsel, (c) under duress, (d) believing that, in light of the behavior of the inquisitor, his limited liberty was in jeopardy, (e) without anyone in a position of authority speaking to Mr. Campbell's outpatient counselor and (f) without due*

*consideration to the decisions already made by no less than a BOP officer who is the NATIONAL Drug Abuse Program Coordinator*, Dr. Lohman magically was able to opine that Mr. Campbell did not suffer from alcohol abuse. Dr. Lohman did not seek any input, speak to or consult with Mr. Campbell's outpatient counselor who had been treating Mr. Campbell for almost three months and who had written that "Mr. Campbell meets the criteria for alcohol dependency." Dr. Lohman did not speak to Beth Weinman, the national Drug Abuse Program Coordinator, who had permitted Mr. Campbell entry into the Program after reviewing not one, but two, diagnoses of alcohol dependence. Dr. Lohman did not speak to Stephanie Hamilton or Charisse Garcia, BOP treatment counselors who had diagnosed Mr. Campbell as being alcohol dependent, who had prepared the treatment summary and who had referred Mr. Campbell to aftercare following his release from the Program. Dr. Lohman simply disregarded or elected to remain ignorant about the documented evaluations of substance abuse from medical doctors, substance abuse specialists who are BOP employees, the national director of the RDAP Program and the evaluation of the counselor that had been treating Mr. Campbell for nearly three months. After employing what can only be termed *analogical thinking*, Dr. Lohman did or said something (Mr. Campbell still has no diagnoses or evaluation report from Dr. Lohman) to someone. Following this, **without being advised of the reasons for the outcome, Mr. Campbell simply was seized without warning and dragged back to the FCI, Miami.**

9

## MEMORANDUM and LEGAL ARGUMENTS

The purpose of a Petition for Writ of Habeas Corpus is to test the legitimacy of the detention of the individual whose freedom is unlawfully or irresponsibly restrained by any branch or agency of the government. Scaggs v. Larsen, 90 S.Ct. 747, 393 U.S. 483 (1979). See, United States v. Tootle, 65 F.3d 381 (4th Cir.), *cert. denied* 116 S.Ct. 1360, 517 U.S. 1123 (1995). Habeas Corpus provides

> an effective and speedy instrument by which judicial inquiry may be had into the legality of the detention of a person. See Peyton v. Rowe, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426.[FN12]... But the statute does not limit the relief that may be granted to discharge of the applicant from physical custody. Its mandate is broad with respect to the relief that may be granted. It provides that '(t)he court shall * * * dispose of the matter as law and justice require.'28 U.S.C. s 2243. The 1966 amendments to the habeas corpus statute seem specifically to contemplate the possibility of relief other than immediate release from physical custody. At one point, the new s 2244(b) (1964 ed., Supp. II), speaks in terms of 'release from custody or other remedy.' See Peyton v. Rowe, supra; Walker v. Wainwright, 390 U.S. 335, 88 S.Ct. 962, 19 L.Ed.2d 1215 (1968). Cf. Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941).

Carafas v. LaVallee, 88 S.Ct. 1556, 391 U.S. 235, 239 (1968).

In addition, as the Supreme Court said in Jones v. Cunningham, 83 S.Ct. 373, 371 U.S. 236, 242 (1963), the Great Writ

> always could and still can reach behind prison walls and iron bars. But it can do more. It is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose-the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty [sic].

Clearly, despite the breadth of the Great Writ, in order for an individual to invoke it, he or she must have exhausted administrative remedies <u>except in matters containing special circumstances such as those now before this</u> Court.   The requirement of exhaustion of administrative remedies does not apply where there are no timely and effective administrative remedies still open to the inmate.  See, <u>Albano v. Anderson</u>, 472 F.Supp. 931 (D.C. Pa. 1979).   In the case of <u>United States v. Morales-Morales</u>, 985 F.Supp 229, 230-231 (D. Puerto Rico, 1997), the Court said:

> <u>18 U.S.C. § 3621(b)</u> bestows upon the Bureau of Prisons primary authority to determine a prisoner's place of confinement, specifically mandating that, "[t]he Bureau of Prisons shall designate the place of a prisoner's imprisonment. … It stands to reason that <u>18 U.S.C. § 3624(c)</u>, has been construed as an administrative provision which allows the Bureau of Prisons to place sentenced prisoners, serving the last ten percent of their prison term (for a term not to exceed six months), in relaxed-security facilities or other pre-release conditions: **Pre-release custody.** The Bureau of prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement. The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during such pre-release custody. <u>18 U.S.C. § 3624(c) (1996)</u>.   The Court notes that defendant has not exhausted administrative remedies before the Bureau of Prisons based on the provisions of <u>Section 3624(c)</u>. *See, e.g.,* <u>28 C.F.R. §§ 542.10</u> *et seq.* (Administrative Remedy Procedure for Inmates); *United States v. Lucas,* 898 F.2d 1554, 1555 (11th Cir.1990) (stating that C.F.R. regulations "set out the procedures that prisoners must pursue prior to seeking relief in a district court" and that "exhaustion of administrative remedies is jurisdictional").

11

However, in the instant case, Mr. Campbell challenges both (1) the place of his present confinement (the Federal Correctional Institution, Satellite Camp, in Miami [Homestead], Florida) where he contends he has been placed by the Bureau of Prisons in violation of its own rules and directives under 18 U.S.C. §§ 3621(b) and 3624(c), and (2) he challenges the "execution of sentence by ... the Bureau of Prisons" and asserts that he must be released back to the Halfway House to complete the limited amount of time he has left on his sentence. See, <u>United States v. Issacs</u>, 393 F.Supp. 597 (D.C. Ill. 1975).

For this Court to have jurisdiction under a Petition for Writ of Habeas Corpus, Mr. Campbell does not have to exhaust administrative remedies where there is neither the time to exhaust those procedures and/or where the incarcerating Court cannot resolve the Petition for Writ of Habeas Corpus within the time left of incarceration. In the case of <u>Pimentel v. Gonzales</u>, 367 F.Supp.2d 365, 371 (E.D.N.Y. 2005), the Court excused the defendant from failing to exhaust the administrative remedies and said:

> Because the exhaustion requirement for <u>Section 2241</u> petitions is prudential, not statutory, courts have frequently waived exhaustion requirements in <u>Section 2241</u> challenges to the December 2002 Policy on the grounds that exhaustion would be futile. *See, e.g., <u>Zucker,</u>* 2004 <u>WL 102779 at \*4</u> (citing *<u>Arango Marquez v. I.N.S.,</u>* 346 F.3d 892, 897 (9th Cir.2003)); *<u>Pinto,</u>* 2004 WL 3019760 at \*3 (collecting cases). Here, not only would an administrative appeal be futile, but without immediate relief by this court, Pimentel could suffer irreparable harm. Pimentel asserts that he is sentenced to a one-year prison term and seeks CCC placement beginning March 30, 2005, six-months prior to his September 30, 2005 release date. (Pet.¶¶ 2, 3.) Were Pimentel required to pursue administrative remedies prior to bringing this action,

he would likely be done serving much, if not all, of his entire sentence such that his request would become moot.

In the instant case, Mr. Campbell suggests that by his removal from Halfway House, under the most flimsy of reasons, and by his re-incarceration, the Bureau of Prisons already has made a decision that Mr. Campbell must be re-imprisoned for the duration of his sentence. Similarly, in the Pimentel case, id at 372, the Court noted:

> More importantly, under February 2005 Rule, BOP has already categorically exercised its discretion to deny Pimentel the relief he seeks. Were Pimentel to proceed through the administrative appeals process, his challenge would invariably be denied pursuant to the February 2005 Rule. Rather than require Pimentel to engage in this futile exercise, Pimentel's failure to exhaust his administrative remedies prior to filing his Section 2241 petition is excused. Congress clearly expresses an intent to withhold that authority)." Id.

As an example illustrating the impossibility of Mr. Campbell ever being able to exhaust administrative remedies within the short time left on his sentence, in the Pimentel case, the Court cited in footnote 6 at page 372:

> Upon receipt of a formal written Administrative Remedy Request on the appropriate form ("BP-9") from an inmate, the Community Corrections Manager ("CCM") has 20 days to respond. The inmate then has 20 more dates to appeal to the Regional Director, who has 30 days to respond. If still dissatisfied, the inmate may appeal to General Counsel within an additional 30 days, to which the General Counsel has 40 days to respond. See 28 C.F.R. § 542. The fact that Pimentel did not file the instant petition until the eve of his final six months in custody, does not of course, compel this court to waive the exhaustion of remedies requirement for fear that Pimentel would suffer imminent harm. However, even if Pimentel diligently initiated administrative proceedings the day he began his one-year sentence, it is unlikely that

13

his claim would have been decided administratively, and then by a habeas court, before the onset of the final six months of his sentence.

In the case of <u>Ferguson v. Ashcroft</u>, 248 F.Supp.2d 547, 563 (M.D. La. 2003), the Court addressed an issue of a Petitioner's failure to exhaust administrative remedies and said:

> In fact, an administrative appeal would be more than futile in this case; it would completely destroy any hope that Ms. Ferguson has of avoiding redesignation and transfer to a federal prison. Even if Ms. Ferguson could put together her complaint and appeals in the proper form in no time at all, the Bureau would still have ninety days, all together, to respond to her requests for relief. Even had she filed a Request for Administrative Remedy on the very day she received her redesignation letter, she would only have been in the middle of her first appeal when the Bureau shuttled her off to prison. Because it is evident that she would not have received relief on appeal, it is also evident that she would have been sent to prison and served for some months before she ever would have had an opportunity to bring her claim before a tribunal-a federal district court-that might actually be able to afford her relief. And of course, Ms. Ferguson could not have exhausted her administrative remedies in no time at all. The most likely result is that she would have been released from prison before she ever got to federal court. By that time, the matter would have become moot. Under no conception of justice and due process is that an acceptable result. Accordingly, the court finds that Ms. Ferguson need not have exhausted the administrative appeals process and may pursue her claims directly in this court.

The above cases demonstrate that Mr. Campbell's failure to exhaust administrative relief should be waived by the Court since Mr. Campbell does not have time to exhaust administrative remedies through the BOP that are required **before** the BOP will reconsider execution of sentence issues of this kind. The time constraints within the administrative remedies would result in Mr. Campbell

being beyond his mandatory release date before there could be resolution of the issues.

WHEREFORE, in light of the *above*, undersigned counsel and Mr. Campbell respectfully request that Mr. Campbell be returned to the Halfway House program to complete the balance of his sentence.

Respectfully submitted,

PATRICIA JEAN KYLE, ESQ.
Counsel for WILLIAM CRAIG CAMPBELL
779 Brickell Plaza, Suite 606
Miami, Florida 33131
Florida Bar No. 018993
TEL: (305) 372-3325
FAX: (305) 372-1644
E-mail: patricia@kylecrimlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the original and a true copy of the foregoing has filed with the Court Clerk this 11th day of March, 2008, served on the Defendants BOP and Warden pursuant to the Federal Rules of Civil Procedure and sent by FAX or e-mail to the Civil Division of the Office of the United States Attorney, Miami, Florida.

PATRICIA JEAN KYLE, ESQ.

15

UNITED STATES GOVERNMENT

# memorandum

Federal Prison Camp
Miami, Florida 33177

Attachment J

DATE: January 12, 2006

REPLY TO
ATTN OF: Beth A. Weinman
National Drug Abuse Program Coordinator

SUBJECT: PROVISIONAL NOTICE OF RESIDENTIAL DRUG ABUSE PROGRAM
AND 3621 (E) ELIGIBILITY

TO: William Campbell,    Reg No. 56204-019

## SECTION 1 - RESIDENTIAL DRUG ABUSE PROGRAM ELIGIBILITY

You have requested participation in the Bureau's Residential Drug Abuse Program.  My review
of your case indicates that you

    X   DO have a documented diagnosis

       DO NOT have a documented diagnosis

which meets the criteria for admission to the residential drug abuse program.  It appears that
you

    X   DO qualify to participate in the residential program.

       DO NOT qualify to participate in the residential program.

Comments (if not eligible):

    See Attached Memorandum

SECTION 2 - PROVISIONAL § 3621(E) ELIGIBILITY - (to be completed only if the inmate has
completed or is eligible for the residential drug abuse treatment program)

For Residential Drug Abuse Program graduates to be eligible for early release, they must
(DAPC must initial):

      not be an INS detainee

      not be a pre-trial inmate



Exhibit A

# Certificate of Completion

This Certifies That

## WILLIAM CAMPBELL

Has Successfully Completed All Requirements Of The 500 Hour

## Comprehensive Drug Abuse Treatment Program

And is Hereby Acknowledged With This Certificate For His Effort Toward His Personal Growth On This Seventh Day Of December Two Thousand and Seven.

Charisse Garcia
Drug Abuse Treatment Specialist



Dr. Stephanie Hamilton
Drug Abuse Program Coordinator

Exhibit B

# P.E.C., Inc. OUTPATIENT COUNSELING CENTER

1521 FOREST HILL BLVD., SUITE # 1
WEST PALM BEACH, FL 33406
(561) 969-1221        (561) 575-9990

2582 W. INDIANTOWN RD, SUITE # 1
JUPITER, FL 33458

March 05, 2008

RE: William Campbell        DOB:5 -25-53

Mr. Campbell began TDAT (Transitional Drug Abuse Treatment) program December 20, 2007. Since that date, we have met individually for an hour each week and in group sessions an hour and a half each week. Based on his assessment, he was a social drinker initially, then significantly increased his alcohol consumption when he was dealing with stress in his life. He stated that he would consume alcohol frequently to deal with stress in his life Some of the situations that caused him to consume alcohol in excess were the death of his mother, legal problems, management of back pain, and knowledge that he could be incarcerated. Right before his incarceration he reported that he drank five to six glasses of alcohol a night. This indicates symptomology of alcohol dependence. It is my professional opinion based on our initial interview and our therapeutic sessions that Mr. Campbell meets the criteria for alcohol dependence.

This was verified by the results of our psychosocial assessment. During the counseling process, client has actively participated with all treatment recommendations. Client is responsible, compliant, and has attended all scheduled appointments. He is actively focused on his sobriety.

I have been working with clients who have substance abuse problems for the last ten years. In my professional experience, clients who are actively working on their sobriety need to remain in treatment until goals have been met. I feel Mr. Campbell is greatly benefiting from TDAT program. It is my experience that clients who admit they have an alcohol problem need to remain in treatment until I professionally feel he will not relapse.

Please do not hesitate to contact me if you have any questions.

*Elise Powell*
Elise Powell , LMHC

Exhibit C

# P.E.C., Inc. OUTPATIENT COUNSELING CENTER

1521 FOREST HILL BLVD., SUITE # 1
WEST PALM BEACH, FL 33406
(561) 969-1221
(561) 969-1241 (Fax)
Pectx@bellsouth.net (Email)

2562 W. INDIANTOWN RD. SUITE # 1
JUPITER, FL 33458
(561) 575-9990

## TRANSITIONAL SERVICES PROGRAM

## BUREAU OF PRISONS TREATMENT PLAN

INMATE: Campbell, William
RRC: WEST PALM BEACH, FL

REGISTER #: 56204-019
DATE OF ASSESSMENT: 12/20/2007

ARRIVAL DATE: 12-14-2007

PROJECTED RELEASE DATE: 6-10-2008

BACKGROUND HISTORY: Mr. Campbell is a 54-year-old black. He has 2 children, one daughter and one son. He was convicted of tax evasion and incarcerated at FPC Miami, Florida. He volunteered to participate in the RDAP program for treatment of alcohol dependence and completed RDAP December 7, 2007.

Statement of Problem:
Mr. Campbell reports consuming alcohol one year prior to his arrest and continued to consume alcohol until his arrest. Mr. Campbell reports understanding the negative consequences of alcohol abuse.

Diagnosis:

Axis I        Alcohol Dependence in sustained full remission in a controlled environment 303.90

Axis II       None       V71.09

Axis III      None

Axis IV       Incarceration

V             GAF=70

## TREATMENT PLAN

**1) COMMUNITY ADJUSTMENT**
GOALS/OBJECTIVES: Client will use counseling services to assist in transition from incarceration to RRC and community.
ACTION PLAN: Once a week, client will list and discuss in group and individual counseling three emotional factors and barriers related to adjustment to community.
TIME FRAME: Begin 12-27-07 Target date: 1-29-08
GOALS/ OBJECTIVES: Client will find employment
ACTION PLAN: Client will list and discuss the skills needed for employment
TIME FRAME: Begin 12-27-07 Target Date: 1-08-08
GOAL/OBJECTIVE: Client will learn and abide by the rules of the Transitional Drug abuse Treatment program and RRC.
ACTION PLAN: Client will make a list of five obligations that are required of TDAT program and RRC.
TIME FRAME: Begin 1-09-08Target Date: 1-15-08

**2) FAMILY\HOME:**
GOALS\OBJECTIVES: Client will identify and gain a greater understanding about how family interactions impact lifestyle choices.
Action Plan: Client will list and discuss three skills he learned to that will help him avoid misunderstandings and conflict.
TARGET DATE: Begin 1-29-08 Target Date: 2-12-08
GOAL/OBJECTIVE: Client will identify causes of past or present conflict in family relationships.
ACTION PLAN: Client will identify and list five causes of past and present conflict in current relationships.
TIME FRAME: Begin 1-29-08 TARGET DATE: 2-19-08
GOAL/OBJECTIVE: Client will read about and model healthy communication skills.
ACTION PLAN: Client will read about, model and practice three communication techniques in group/individual counseling sessions.
TIME FRAME: Begin 3-18-08 TARGET DATE: 4-01-08

**3) INTERPERSONAL\WELLNESS/SOCIAL**
GOALS/OBJECTIVE: Client wants to have a healthy balance in his wellness program.
ACTION PLAN: On a weekly basis, client will write and discuss three stresses and his physical emotional reactions to stress.
TIME FRAME: 1-22-08 TARGET DATE: 5-27-08

**4) MENTAL HEALTH ISSUES** (No issues or symptoms observed at this time.)

**5) RELAPSE PREVENTION /THINKING ERRORS:**
GOALS/OBJECTIVES: Client will establish a reliable social and family network that supports a alcohol free lifestyle and self-respect.
Action Plan: Client will list and discuss with therapist five family members or friends that support clients' alcohol free lifestyle
TIME FRAME: 3-10-08 TARGET DATE: 5-13-08
GOALS/OBJECTIVES: Client will increase awareness of his early warning signs of relapse

ACTION PLAN: Client will identify and list in writing five personal high-risk situations for relapse
TIME FRAME: 1-29-08 TARGET DATE: 2-26-08
ACTION PLAN: Client will write a relapse prevention/aftercare plan and process plan with group
members and therapist
TIME FRAME: 1-29-08 TARGET DATE: 2-26-08
GOALS/OBJECTIVES: Client will continue to learn about addiction and addictive behaviors.
ACTION PLAN: Client will read about addiction and addictive behaviors list and discuss 3 items
about addiction in group.
GOAL: Client will not allow influence of business or social activities to consume alcohol.
ACTION PLAN: Client will develop list of three refusal statements that he will say instead of
consuming alcohol.
TIME FRAME: 4-01-08 TARGET DATE: 5-20-08


_____                    _____
Elise Powell, LMHC                         DATE


_____                    _____
Client                                     DATE


## TREATMENT REGIMEN

In order to accomplish the above goals, the following treatment regimen is recommended:

Two 30 minutes units of Individual counseling per week
Three 30 minutes of Group counseling per week

$$\frac{399}{12/14/07}$$

### TREATMENT SUMMARY AND REFERRAL
### FOR RESIDENTIAL DRUG ABUSE TREATMENT

TO:  (Check all that apply)
        Community Corrections Manager
   X   Transitional Services Manager
   X   United States Probation Officer
   X   Institutional Drug Abuse Treatment Coordinator
        Community Treatment Provider

RE:  Name: William Campbell
      Register No: 56204-019

Release Status:  (Check only one)
        BOP/General Population
   X   BOP/CCC Placement
        Supervised Release
        Parole
        No criminal justice hold

### TREATMENT SUMMARY NARRATIVE

Mr. Campbell volunteered to participate in the 500-hour Residential Drug Abuse Program
(RDAP) at FPC Miami, Florida for treatment of his alcohol dependence. He began the program
on March 16, 2007, and he successfully completed the program on December 7, 2007. His
Presentence Investigation Report (PSI) and Bureau of Prisons (BOP) documents were used as
sources of collateral information. Any other information used will be identified.

### IDENTIFYING INFORMATION:

Mr. Campbell is a Black male. He is a citizen of the United States of America. He has no
detainers and no pending charges. He is currently incarcerated at FPC Miami, Florida, with a
projected release date of June 10, 2008, via 18 U.S C. 3621(e) BOP Substance Abuse Treatment
Release.

Mr. Campbell was convicted of tax evasion.

### SOCIAL/FAMILY HISTORY.

The inmate was raised by his biological parents. He has 3 siblings, all raised surrounded by
several close family members. Mr. Campbell was brought up in an environment where politics
was very prominent. His father was president of the National Association for the Advancement

Exhibit D

of Colored People, NAACP, therefore actively involved in demonstrations and political activity. He recalls his upbringing as "traditional" and nurturing in nature. He stated that he has a good relationship with his family today. His current relationship with his wife is good. He has Juris Doctor Degree. Mr. Campbell's health is good.

SUBSTANCE USE/MENTAL HEALTH HISTORY:

Mr. Campbell's PSI reflected that he used alcohol up to one year prior to his arrest. He continued to use these drugs up until his arrest.

   Diagnosis:
   303.90 Alcohol Dependence

COURSE OF TREATMENT:

Mr. Campbell began the 500-hour Residential Drug Abuse Program on March 16, 2007. Upon his entry in the program, he expressed a recognition that his drug use had a negative impact on his life. He expressed that although he had been without the use of drugs for a while he still needed help in learning how to live life without the use of illegal substances. Prior to admission to the
program, he agreed to refrain from using any mood altering substances as a condition of participation in the program.

Within the 500-hour Residential Drug Treatment Program, Mr. Campbell participated in structured activities designed to help him evaluate his substance abuse history and factors which contributed to it's development, as well as other self-defeating behaviors and their effects on all areas of his life. Treatment also focused on his accepting personal responsibility for his actions, and on teaching him positive skills necessary to maintain a substance free and crime free lifestyle. The curriculum included the following core courses: Orientation, which consisted of a brief overview of the modules that are going to be covered; Wellness Lifestyle and Wellness Activity, which focused on the development of balanced, healthy style of living; The Personal Change Plan which is based on the way people change and the stages of change; Rational Self Counseling focuses on irrational thinking and how to control feelings and behavior; Living With Others focuses on healthy.vs unhealthy relationships and communication skills. It also focuses on recognizing feelings as well as anger management and empathy. Criminal Lifestyle, which examined criminal thought patterns, the relationship between criminal behavior and substance abuse, the impact of these behaviors on self and others and ways to bring about personal change; Relapse Prevention, which focused on identifying individualized relapse prevention "triggers" and the development of a personalized Relapse Prevention Plan and Transitional Issues, which focused on re-entry into the community.

Generally, Mr. Campbell had a good rapport with both staff and inmates. He was supportive of

fellow group members and provided appropriate feedback during group sessions. His primary treatment goals were: (1) To maintain the habit of abstaining from all illicit drugs whenever he thinks about returning to the community. (2) Identify common thinking errors, identify thinking errors he has made and use his awareness of such thinking to avoid participating in any criminal behaviors. (3) To learn about relapse prevention skills and develop an effective relapse prevention plan. (4) To learn more about the physical and psychological consequences of substance use   Within his treatment plan, one of the identified goals was to maintain his sobriety once released into the community. He identified ways he will be able to accomplish this goal by being honest and open minded during treatment, participate during group and receive constructive feedback from his peers. He was open to the fact that other people's experiences have the potential to help him in the future. He feels he has become a better problem solver and has set forth goals for himself to meet once released into the community.  He did well identifying the common thinking errors as well as correcting them. He has developed several goals to help him cope with thinking errors that may lead to destructive behaviors. He has also become more knowledgeable about the affects of drugs and alcohol not only on himself but others as well. He is better able to understand the harm his behavior has caused and has stated that he is committed to his recovery and lifestyle changes.

He has been openly sharing how he had problems related to substance use in the past. He has been participating in group sessions and is being encouraged to focus on his problems  He will continue to explore how his substance use may have caused problems for him in his life. He is also going to explore issues related to his thinking errors. He does offer appropriate verbal support to others and is attempting to focus on being more open minded to others viewpoints on life. Mr. Campbell has taken on the role of leader amongst the participants in his group. He does participate well in group, does well on all assignments and complies with all required rules and assignments. He openly discusses his alcohol issues and is able to take constructive criticism. He seems to be understanding concepts discussed and has been able to apply them to his personal situation. He has the tendency to focus on issues other than his own. He is knowledgeable on the concepts discussed in group and seems to be able to apply them to his own personal experiences. He was encouraged to explore issues related to relationship, communication and irrational thoughts.

He was an active participant in group discussions. He was open about his personal issues and often used examples from his own life to highlight the significance of the concepts presented in group sessions. His participation was generally a positive influence on the group process. He believes that one of the benefits of the program was the opportunity to learn things about himself that he had not previously explored. He feels this is important because he can now use these tools in the recovery process.

He completed all his homework and treatment plan assignments in a timely and thorough manner. He was open to constructive criticism and felt comfortable giving constructive feedback.

(12/18/2007) SERO/Trans Svcs Pgm~ - Tx Summary - Campbell.wpd

**RELAPSE PREVENTION PLAN:**

In order to prevent relapse to substance use in the community, Mr. Campbell plans to do the following:

1) Refuse offers of all mood changing substances.
2) Avoid hanging out with old friends.
3) Identify thinking errors and correct them.
4) Think of the negative consequence should the thought of drugs and alcohol come to mind.
5) Think choices out prior to making a decision.
6) Surround himself with people who support his sobriety
7) Spend quality time with family
8) Do an "honest day's work" five days a week

**STRENGTHS AND WEAKNESSES:**

Mr. Campbell believes he has learned how to structure his life while in treatment and is going to continue his routine with regards to his overall wellness. He appears to have learned to use the tools necessary to help him in his recovery. He has developed a greater awareness of his thinking errors and appears to have learned more effective ways of coping with them. He is willing to work hard to live a productive life. He is working on a support system which will include family members and other individuals that have been supportive during this ordeal. He must continue to work hard on avoiding people and places that will be destructive to his recovery.

**RECOMMENDATIONS FOR FURTHER TREATMENT:**

1) Participate in individual or group counseling once per week in Transitional Services during his stay in a Community Corrections Center (CCC).

2) Receive random urine tests during his stay in CCC.

3) Describe high risk situations or relapse temptations, and his attempts to cope with them, during each aftercare session.

4) Continue to practice identifying his errors in thinking that lead to "high risk" situations.

(12/18/200/) SERO/Trans Svcs Pgm~ - Tx Summary - Campbell.wpd                                    Page 5

Completed by: _____        12-07-2007
                    Signature                   Date

Printed Name:       Charisse Garcia
                    Drug Abuse Treatment Specialist

Institution:        FCI Miami

Reviewed by: _____         12-07-2007
                    Signature                   Date

DAPC's Printed Name
& Degree:           Stephanie Hamilton, Psy.D.

Reviewed by: _____         12-07-2007
                    Signature                   Date

                    William Campbell
                    Inmate's Printed Name

Received by:    /S/
                    Signature            Date

              Printed Name of Transitional Drug Abuse Treatment Staff

February 28, 2008    12:30 p.m.

This morning I was asked to conduct an interview - clinical interview with Dr. Chip Lohman regarding my eligibility to be in the RDAP program. I indicated that I wanted to have my attorney present because I had my eligibility determined over a year ago. I successfully completed the program, I had been in aftercare for 2 months and I objected to the entire process. Repeatedly Dr. Lohman stated that there was no prohibition on my having an attorney present. I then indicated I wanted my attorney present.

At 12:25, I was told to speak to Ms. Dennings from Atlanta. She directed me to conduct the interview even though I objected. wantin my attorney to be present. She stated that if I refused to conduct the interview, I would, be returned to;

Exhibit E.

attorney, Michael Coleman, who vehemently objects to my forced participation in this process. I only am participating because I have been threatened if I do not do so; so this is under duress and threat. Further, I do not believe this interviewer, Dr. Lohman, to be objective or this process to be equitable.

2/28/08

I attach the notes from Ms. Erica Gavin of my earlier discussion with Dr. Lohman.

RRC Director
2/28/08

9:45AM - 9:52AM

Me. Spoke to Central
office about having
Lawyer.

Requested serveral
times to have No reason
Lawyer Present. to have an
Attorny Present.
No Answer              you may
form DR.              call him.

Fully willing to Comply
as long as infor gets to Lawyer.

Eligibility
        interview

Program
    Complete.

Asking for atl. Present
If I have that write
then Please let Me
ns have there legal Dept. get the info
                                     

Requesting attorny Present. Counsell?
Asking for any relaguations

Residential Drug abuse Prog
    36.21E.
    Regulational

Me. Campbell wants
The Doctors Legal
    Staff to send info
    to his Lawyers.

Dont have choice
    to have an attorney
    Present.

Not

Legal advice
    not giving

%JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)  NOTICE: Attorneys MUST Indicate All Re-Filed Cases Below.

FILED by **IC** D.C.
ELECTRONIC

**MAR. 11, 2008**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## I. (a) PLAINTIFFS
WILLIAM CRAIG CAMPBELL

## DEFENDANTS
UNITED STATES BUREAU OF PRISON
PASTRANA, Warden, Federal Correctional Institution, Miami, ☐

**(b)** County of Residence of First Listed Plaintiff   Miami-Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Miami-Dade
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Patricia Jean Kyle, Esq., 799 Brickell Plaza, Suite 606, Miami, Florida 33133  (305) 372-3325; FAX: (305) 372-1644
e-mail: patricia@kylecrimlaw.com

Attorneys (If Known)

**(d)** Check County Where Action Arose: ☑ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☐ 3  Federal Question (U.S. Government Not a Party)
☑ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

Dade 08-20636- CIV-Ungaro O'Sullivan

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☑ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Re-filed- (see VI below)
☐ 4  Reinstated or Reopened
☐ 5  Transferred from another district (specify)
☐ 6  Multidistrict Litigation
☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO     b) Related Cases ☐ YES ☑ NO

JUDGE _____   DOCKET NUMBER _____

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 2241  Violation of constitutional rights

LENGTH OF TRIAL via  2  days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE
March 11, 2008

FOR OFFICE USE ONLY
AMOUNT  5.00   RECEIPT #  97659   IFP  N/A