FILED IN CHAMBERS
R CHA- D..':' : ' IRY
U S U C ' ч ta

JUN 1 5 2006

LUTHER P. THOMAS, Clerk
By:
Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA      ·

v.

WILLIAM C. CAMPBELL,

       Defendant.

CRIMINAL ACTION NO.
1:04-CR-0424-RWS

## SENTENCING ORDER

On May 10, 2006, the jury returned a verdict finding Defendant William

C. Campbell ("Defendant") guilty of three counts of tax evasion, and acquitting

him on charges that he violated RICO and committed several acts of bribery.  A

Presentence Investigation Report ("PSI") was prepared by the United States

Probation Office and submitted to the parties, and the parties filed Objections

thereto   On June 13, 2006, the Court conducted a sentencing hearing at which

the Court heard additional evidence and arguments of counsel, ruled on the

Objections to the PSI, determined the applicable sentencing guideline range

under the U S  Sentencing Guidelines, and sentenced Defendant based upon a

consideration of the Sentencing Guidelines as well as the factors set out in 18

U S.C. § 3553.

In the hearing, the Court briefly stated the bases for its rulings on the record. This Sentencing Order is issued to be filed simultaneously with the Judgment and Commitment Order so as to fully set out the grounds for the Court's rulings as stated in the sentencing hearing.

## NON-GUIDELINE OBJECTIONS

Defendant raised a number of Objections to matters within the PSI that did not affect the Guidelines calculation  As to those Objections, the Court rules as follows:

(a) Paragraph 9 - The Objection is overruled.  The Court finds that the description of offense conduct is merely background and is not inappropriate.

(b) Paragraph 12 - The Objection is overruled because the response provided by the Probation Officer sufficiently clarifies the information provided in this paragraph.

(c) Paragraph 13 - The Objection is overruled because the jury found that Defendant was guilty of Racketeering Act 10.

(d) Paragraph 14 - The Objection is overruled because the information contained within the paragraph is not irrelevant.

(e) Paragraph 19 - The Objection is overruled because the additional

2

AO 72A
(Rev 8/82)

information provided in the Objection as well as the Probation Officer's response, sufficiently clarifies the paragraph.

(f) Paragraph 20 - The Objection to is sustained. The paragraph will be stricken from the PSI

(g) Paragraph 24 - The Objection is overruled because the information contained within the paragraph is simply background information.

(h) Paragraph 26 - The Objection is overruled because the information contained within the paragraph is simply background information.

(i) Paragraph 28 - The Objection is sustained. The paragraph will be stricken from the PSI.

(j) Paragraphs 29-30 - The Objection is overruled. These were statements made by Defendant to the media and may be considered by the Court.

(k) Paragraphs 55-56 - The Objection is overruled because the information contained within the paragraphs is not irrelevant

## GUIDELINE OBJECTIONS

The Court places into seven (7) categories the Objections of the parties

3

to the PSI concerning findings that affect the Guideline calculations.  As to those Objections, the Court rules as follows:

## 1.   Tax Rate

The base offense level for crimes of tax evasion under the 1998 Federal Sentencing Guidelines is dependent upon the amount of "tax loss."  U.S. SENTENCING GUIDELINES MANUAL § 2T1.1(a) (1998).[1]  According to the Guidelines, "the tax loss is the total amount of loss that was the object of the offense (i e., the loss that would have resulted had the offense been successfully completed)."  U.S. SENTENCING GUIDELINES MANUAL § 2T1 1(c)(1)  "[A]ll conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated."  U.S. SENTENCING GUIDELINES MANUAL § 2T1.1

In calculating the amount of tax loss, Defendant asserts that the Court should apply a tax rate of 28%, ignore his state tax liability, and provide him the benefit of unclaimed deductions.  According to notes that accompany the

---

[1] All references to the Sentencing Guidelines shall be to the 1998 edition of the U S  Sentencing Guidelines Manual.

4

1998 Guidelines, "the tax loss shall be treated as equal to 28% of the unreported gross income . . . *unless a more accurate determination of the tax loss can be made*." U.S. SENTENCING GUIDELINES MANUAL § 2T1 1 (emphasis supplied). Here, Defendant's own tax returns show that his applicable tax rate for years 1994 through 2000 was 31%, and in 2001, was 30.5%. Because these figures represent a "more accurate" tax rate than the 28% default rate specified in the 1998 Guidelines, the Court will apply these rates in calculating the amount of tax loss. U.S. SENTENCING GUIDELINES MANUAL § 2T1.1, application note (A). In addition, the Court will increase the applicable tax rates by 6% to take into account the impact of state taxes on the aggregate tax loss. See O C.G.A. § 48-7-20 (setting forth tax rate applicable to individual taxpayers), United States v. Whistler, 139 Fed. Appx. 1, 2 (9th Cir 2005) (aggregating state and federal tax losses, and stating, "Nor did the district court misapply the Guidelines in taking account of the filing of false state tax returns as relevant conduct to determine Whistler's sentence."); United States v. Jordan, 66 Fed. Appx. 488, 490 (4th Cir 2003) (holding likewise); United States v Powell, 124 F.3d 655, 663-64 (5th Cir. 1997) (holding likewise). This

5

results in an applicable tax rate of 37% for the years in question, except 2001, for which the rate is 36.5%.

After reviewing applicable precedent, moreover, the Court concludes that Defendant is not entitled to have the tax loss reduced by some unspecified amount to reflect the availability of deductions. Although it acknowledges that the Second Circuit has adopted a contrary approach, see United States v. Martinez-Rios, 143 F.3d 662 (2d Cir. 1998), the majority view, and the one which finds consonance with the reasoning employed by the Eleventh Circuit, is that unclaimed deductions should not be taken into account when determining tax loss under the Guidelines. See United States v. Chavin, 316 F.3d 666, 677 (7th Cir. 2002) (defendant was not entitled to recalculation of his tax return to consider unclaimed deductions in determining tax loss); United States v. Spencer, 178 F.3d 1365, 1368 (10th Cir. 1999) ("We do not interpret [the Guidelines] as giving taxpayers a second opportunity to claim deductions after having been convicted of tax fraud."); United States v. Valentino, 19 F.3d 463, 465 (9th Cir. 1994) (holding likewise); see also United States v. Patti, 337 F.3d 1317, 1324 (11th Cir. 2003) (discussing the permissible aggregation of corporate and individual false reportings without the benefit of an overall tax

6

loss reduction, and rejecting Martinez-Rios, held: "we do not believe that the possibility of a lower tax liability had the taxes been reported properly should change th[e] result").

## 2. Tax Loss

The Court finds that the most reliable method for calculating the tax loss is based on cash expenditures and sources of cash as suggested in the PSI. The calculations of the tax loss are set out in Appendices A and B attached to this Order and incorporated herein by reference.[2]

The Court finds by a preponderance of the evidence that for the years 1994 through 2000, the total unreported income is $159,420.68 and for 2001, the total unreported income is $10,380.12. Applying the 37% rate to the 1994-2000 unreported income yields a tax loss of $58,985.65 for those years. Applying the tax rate of 36.5% to the 2001 unreported income yields a tax loss of $3,788 74. Thus, the total tax loss equals $62,774.39. Under the Sentencing Guidelines, this amount of tax loss results in a base offense level of thirteen (13). U.S. SENTENCING GUIDELINES MANUAL § 2T4.1(H) (tax loss in excess of $40,000 but less than $70,000 requires application of offense level of 13).

---

[2] The format for these calculations is taken from pages 26 and 27 of the PSI

### **3.** **More Than $10,000 from Criminal Activity**

According to the Guidelines, "[i]f the defendant failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity," the Court should increase the offense level by two levels. U S. SENTENCING GUIDELINES MANUAL § 2T1 1(b)(1). In the instant case, the Court concludes that Defendant did receive more than $10,000 from criminal activity in 1999 and therefore, increases the offense level as provided by § 2T1.1(b)(1)

The Government contends that an enhancement under § 2T1.1(b)(1) is warranted on a variety of grounds. Its principal argument is that Defendant's (ultimately successful) defense to the RICO and bribery charges at trial was that the disparity between his lawful earnings and his cash expenditures during the years relevant to the indictment could be explained by his success at locally hosted poker games–poker games in which he allegedly won approximately $20,000 per year. In addition, the Government urges the Court that it should consider Defendant's receipt of corrupt payments from Dan DeBardelaben, as alleged in Counts II, III, and IV of the Indictment, as evidence supporting a § 2T1.1(b)(1) enhancement.

8 .

AO 72A
(Rev 8/82)

The Court finds the Government's principal argument unavailing.  To be sure, gambling is a crime in Georgia, <u>see</u> O C.G.A § 16-12-21 (making it a misdemeanor for an individual to "[p]lay[ ] and bet[ ] for money or other thing of value at any game played with cards, dice, or balls"), and Defendant's receipt of more than $10,000 in any given year from poker games would warrant imposition of the requested enhancement <u>See</u> U.S. SENTENCING GUIDELINES MANUAL § 2T1.1 (defining criminal activity as "*any* conduct constituting a *criminal offense* under federal, *state*, local, or foreign law") (emphases supplied)  In support of its argument that Defendant received over $10,000 in gambling winnings, the Government points to the trial testimony of Gabe Pascarella as well as statements by Defendant to the media during the trial  Moreover based upon unequivocal statements Defendant made to the media during the trial, the Court might well be justified in finding that Defendant received more than $10,000 in gambling winnings during a calendar year.

However, Defendant argues, persuasively, that the evidence adduced at trial respecting his success at the poker tables was equivocal and ambiguous at best, and that concrete assertions respecting his poker winnings primarily took

9

the form of arguments from counsel. Without question, there was evidence that Defendant enjoyed some gambling successes during the period in question. That evidence, moreover, may have engendered reasonable doubt in the minds of the jury as to whether his undeclared income flowed from racketeering activities and the receipt of corrupt payments. But, evidence sufficient to generate reasonable doubt will not, in all instances, sustain a finding based on the preponderance of the evidence. In the instant case, viewing all the evidence presented at trial and during the sentencing hearing, the Court cannot find, by a preponderance of the evidence, that Defendant received more than $10,000 in any given year from unlawful gambling.

This conclusion compels the Court to examine whether the Government's other asserted basis for an enhancement under § 2T1.1(b)(1) mandates the requested increase in offense level. After carefully considering the matter, the Court is persuaded that a preponderance of the evidence elicited at trial showed that Defendant obtained significantly more than $10,000 in 1999 in the form of corrupt payments from Dan DeBardelaben, as alleged in Counts II and III of the Indictment. On the basis of this finding, an enhancement under § 2T1.1(b)(1) is appropriate

10

In reaching this result, the Court appreciates that the two level

enhancement it is imposing rests on conduct for which Defendant was

acquitted at trial  The jury's verdict showed that its members were not

convinced, *beyond a reasonable doubt*, that Defendant took the alleged

payments.  The Court respects this verdict and the jurors by whom it was

rendered, and is entirely convinced that their judgment was the product of

careful. thoughtful, and deliberative application of the governing evidentiary

standard to the facts presented at trial.  The evidentiary standard applied here,

however, is very different

The legal principles that guide this Court's inquiry are well-settled:

"Relevant conduct of which a defendant was acquitted nonetheless may be

taken into account in sentencing for the offense of conviction, as long as the

government proves the acquitted conduct relied upon by a preponderance of the

evidence."  United States v. Barakat, 130 F.3d 1448, 1452 (11th Cir. 1997)

(citing United States v. Watts, 519 U.S. 148, 117 S. Ct  633, 136 L. Ed. 2d 554

(1997)); see United States v. Kucera, 167 Fed. Appx. 136, 138 (11th Cir. 2006)

(under post-Booker[3] advisory guidelines scheme, district court committed no

---

[3] United States v. Booker, 543 U.S 220, 125 S Ct 738, 160 L  Ed  2d 621 (2005)

11

error in relying on factual findings made by a preponderance of the evidence); United States v. Tynes, 160 Fed. Appx. 938, 940 (11th Cir. 2005) (even following Booker, a "district court may . . . continue to consider relevant *acquitted* conduct when applying the guidelines in an advisory manner") (emphasis in original), see also United States v. High Elk, 442 F.3d 622, 626 (8th Cir. 2006) ("for purposes of calculating the advisory guidelines range, the district court may find by a preponderance of the evidence facts regarding conduct for which the defendant was acquitted"); United States v. Magallanez, 408 F.3d 672, 684 (10th Cir. 2005) ("A jury verdict of acquittal on related conduct    does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence.") (internal quotations omitted); United States v. Reid, 357 F.3d 574, 581 n.8 (6th Cir. 2004) ("[C]onduct which was the subject of an indictment count of acquittal may result in a sentencing enhancement if proved by a preponderance of the evidence."), United States v. Dozier, 162 F.3d 120, 125 (D.C. Cir. 1998) ("Accordingly, a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance

12

of the evidence.") (internal quotations omitted); <u>United States v. Berrios</u>, 132

F 3d 834, 839 (1st Cir 1998) (holding likewise).

As a result, insofar as Defendant argues that the jury's failure to convict

him of the receipt of corrupt payments necessitates a like conclusion by this

Court at sentencing,

> [t]his is wrong. The jury was asked to decide whether
> there was proof of the defendant['s] guilt beyond a
> reasonable doubt, whereas the issue in sentencing is
> whether the defendant['s] guilt is shown by a
> preponderance of the evidence, a lower standard, so
> that the failure of the proof to satisfy the first standard
> doesn't show that it fails to satisfy the second.

<u>United States v DiDomenico</u>, 78 F.3d 294, 304 (7th Cir. 1996) (rejecting

argument that "in finding guilt where the jury did not the judge usurped the

jury's function"). A verdict of acquittal is not a finding of innocence. "An

acquittal by the jury proves only that the defendant was not guilty beyond a

reasonable doubt." <u>Magallanez</u>, 408 F 3d at 684  And it is what the facts show

by a preponderance of the evidence, not beyond a reasonable doubt, that

impacts a defendant's sentence.

13

Here, Defendant was acquitted of bribery and RICO violations–

violations that, if proven beyond a reasonable doubt, could have resulted in

years being added to Defendant's sentence.  Instead, the Court's finding that he

took corrupt payments from Mr. DeBardelaben suggests an increase in his

sentence of, at most, a few months.  The material disparity between the

evidence necessary to sustain a conviction and that necessary to support a

sentencing enhancement is reflected in the substantially different effects those

findings have on Defendant's liberty

A preponderance of the evidence establishes that more than $10,000 of

the income Defendant failed to report in 1999 was acquired through his

criminal activities   In light of the foregoing, the Court finds a two-level

increase in Defendant's offense level to be proper.

### 4.   Sophisticated Concealment

The Guidelines additionally provide that, "[i]f sophisticated means were

used to impede discovery of the existence or extent of the [tax] offense," the

Court should increase the offense level by two levels.  U S. SENTENCING

GUIDELINES MANUAL § 2T1.1(b)(2)   The Court finds that the evidence

supports this enhancement.

14

The Guidelines attempt to clarify the concept of "sophisticated means" by saying that such means "include[ ] conduct that is more complex or demonstrates greater intricacy or planning than a routine tax-evasion case." U.S. SENTENCING GUIDELINES MANUAL § 2T1.1. "An enhancement would be applied, for example, where the defendant used offshore bank accounts, or transactions through corporate shells or fictitious entities." Id ; see also United States v. Clements, 73 F.3d 1330, 1340 (5th Cir. 1996) (explaining that the examples provided by the statute are only illustrative, not exhaustive). Further elucidating the contours of this somewhat elusive concept, the Circuit Courts of Appeal have explained that "the essence of the definition [of sophisticated concealment] is merely 'deliberate steps taken to make the offense . . . difficult to detect." United States v Kontny, 238 F.3d 815, 821 (7th Cir. 2001).

Here, several characteristics of the offense persuade the Court that the requested enhancement is appropriate. First, Defendant's use of campaign accounts and credit cards held by another individual to conceal personal cash expenditures demonstrates a deliberate attempt to impede the discovery of both the existence and extent of his tax fraud. What is more, his ubiquitous reliance on cash to engage in all manner of financial transactions, from the most basic

15

to the most substantial, reflects what can only be viewed in the aggregate as a purposeful attempt to conceal the scope of his offense.

These attributes of Defendant's conduct illustrate a level of complexity that take his crimes well beyond the "routine tax-evasion case." Barakat, 130 F.3d at 1456. The Court finds an enhancement under § 2T1.1(b)(2) appropriate

## 5. Obstruction of Justice

The Government seeks a two-level enhancement for obstruction of justice. During the presentence investigation, the Government put Defendant on notice that it intended to rely upon testimony from Gabe Pascarella to establish that Defendant took documents related to the investigation from Pascarella's home. Prior to the hearing, Defendant submitted an Affidavit in response to the Government's allegations. In the Affidavit, Defendant states: "I never requested or removed any documents from Gabe Pascarella at any time. I never asked him if I could take any records from him. I never took any documents from him." (Campbell Aff at ¶ 2). Before the Court took evidence on this issue, the Government inquired as to whether the Court would consider Defendant's Affidavit in the event that Defendant did not testify and subject

16

himself to cross-examination at the hearing. Because a defendant is entitled to allocution at a sentencing hearing, the Court stated that even if Defendant did not testify at the hearing, the Affidavit would be considered. However, the parties were warned that Defendant's failure to testify and submit himself to cross-examination would   go to the weight to be given to his Affidavit, especially if Pascarella testified and subjected himself to cross-examination.

Gabe Pascarella testified in the sentencing hearing that he was contacted by federal agents in July 2000 to schedule an interview. Pascarella immediately notified Defendant that he had been contacted by federal agents about an interview  The next day, Defendant called Pascarella and asked to meet with him. They met on Pascarella's boat on Lake Lanier and talked about the upcoming interview. Defendant gave Pascarella some background information about the investigation. During their discussion, a decision was made that Pascarella would surreptitiously record the interview with the federal agents  Defendant initially provided a recorder, but it did not work. Therefore, Pascarella recorded the interview with a recorder of his own. When Pascarella and Defendant attempted to listen to the recording, they found that it was of

17

very poor quality. Pascarella eventually prepared a transcript of the recording and provided copies of the transcript to Defendant and Defendant's attorneys.

After the interview, Pascarella called Defendant, and Defendant came to Pascarella's home. Pascarella related to Defendant that during his interview, he had been served with a subponea by the federal agents requiring him to produce certain records relevant to the investigation. Pascarella showed Defendant the subpoena and told Defendant about the records that he had in his possession. The records included credit card records from a dedicated credit card account from which Pascarella paid expenses of Defendant; written notes on the credit card records that included the names of Defendant's friends for whom the expenses were incurred; records of cashier's checks used to pay the credit card bills; and tally sheets for some of the poker games in which Defendant had participated.

Defendant requested that Pascarella give him all of the records. Pascarella did not give Defendant all of the records but gave him some of the records from all of the categories mentioned above. Defendant told Pascarella not to worry about the records, and the two of them never discussed the records again. The records would have been evidence of cash expenditures by

18

Defendant through Pascarella's dedicated credit card account as well as of poker winnings of Defendant

Pascarella has been interviewed by the Government on numerous occasions. He also testified on at least two occasions before the Grand Jury and at the trial of this case. However, Pascarella did not disclose the information about the documents given to Defendant until an interview with federal agents after the trial. Pascarella's understanding was that the agents wished to question him about the basis for his opinion that Defendant won as much as $20,000 in poker games in any given year. During the interview, Pascarella disclosed the fact that he had surreptitiously recorded his interview with the federal agents and also disclosed that he had given documents to Defendant

Defendant urges the Court to deny an obstruction of justice enhancement because Pascarella's testimony is not believable. Defendant asserts that Pascarella had not been truthful in previous testimony to the Grand Jury and at trial Also, Defendant points to Pascarella's failure to disclose the information in any prior statements or testimony.

19

The Court finds credible Pascarella's testimony presented at the sentencing hearing that Defendant took documents material to the investigation  First, unlike Defendant, Pascarella's testimony was subjected to thorough and sifting cross-examination.  Second, the Court does not believe that Pascarella's failure to disclose the information earlier means that it is false. Defendant's acquisition of the documents occurred in the same meeting in which Pascarella and Defendant were reviewing the surreptitious recording of Pascarella's interview with federal agents.  Pascarella was concerned that his recording may cause him problems with the Government.  This concern explains his failure to mention the recording in any prior interview or testimony  Even though Pascarella had never mentioned the recording, the fact that it occurred appears to be undisputed.  In fact, the recording is corroborated by the transcript provided by Pascarella to Defendant and Defendant's counsel. When Pascarella finally disclosed the recording, the inclusion of the transfer of documents to Defendant would be a natural part of that disclosure.

To be sure, the Court acknowledges that there are credibility issues with portions of Pascarella's testimony.  Defendant makes a legitimate argument that Pascarella has not been completely truthful under oath at other times in

20

these proceedings [4]  However, weighed against that testimony is the prepared, sworn statement of Defendant.  The Court must consider that Defendant has been found guilty by a jury of making false, sworn statements in tax returns filed with the federal government.  In weighing the relative credibility of the witnesses, the Court finds that the testimony of Gabe Pascarella on this issue is more credible than the Affidavit submitted by Defendant

Therefore, the Court finds a two-level enhancement for obstruction of justice appropriate under § 3C1.1 of the Guidelines.  This is precisely the sort of conduct § 3C1.1 was designed to address.  U.S. SENTENCING GUIDELINES MANUAL § 3C1.1 (stating that obstruction of justice includes "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence)").

## 6.   Abuse of a Position of Trust and Disruption of a Governmental Function

The Government urges the Court to impose a two-level enhancement

---

[4]Also, during his testimony, Pascarella admitted he had filed a tax return understating his gambling winnings and that he failed to claim winnings in other years.

21

based on an abuse of a position of trust, U S SENTENCING GUIDELINES

MANUAL § 2T3B1.3, or disruption of a governmental function, U.S.

SENTENCING GUIDELINES MANUAL § 5K2.7   The Court declines to impose

either.  First, the Court is unpersuaded that Defendant's use of his position of

trust "facilitate[d] or contribute[d] in *a significant way* to the commission or

concealment of an offense."  See Barakat, 130 F.3d at 1454-55 (emphasis

supplied)   To the contrary, the evidence relied on by the Government to

establish such abuse consists primarily of testimony that Defendant had his

assistants perform the ministerial task of relaying statements respecting his

income to Defendant's accountant.  No *significant* facilitation or contribution

has been shown.  Id.  Second, the evidence fails to persuade the Court that

Defendant's malfeasance "resulted in a *significant* disruption of a

governmental function."  U S SENTENCING GUIDELINES MANUAL § 5K2.7

(emphasis supplied)

## 7.   **Public Service**

Defendant requests a downward departure based on his public service

The Court finds that such a departure would be improper.

22

The Guidelines make clear that public service is "not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S. SENTENCING GUIDELINES MANUAL § 5H1.11. While Defendant undeniably used his position as Mayor of the City of Atlanta to do good in the community, the Court does not find that his good works are so extraordinary as to take them beyond the "the political duties ordinarily performed by public servants[.]" See United States v. Serafini, 233 F.3d 758, 773 (3d Cir 2000). What is more, the Court is unwilling to consider Defendant's good works in isolation, divorced from the rampant corruption that plagued his administration [5] See United States v. Wright, 363 F.3d 237, 250 (3d Cir. 2004)

---

[5] Four members of Defendant's administration pled guilty to charges including corrupt payments, perjury, and tax fraud (Joe Reid - Executive Director of Empowerment Zones, Larry Wallace - Chief Operating Officer, Fred Prewitt - Head of Civil Service Board, and Thodur Bavan - Operations Manager for Water System). One member of the Administration was found guilty of perjury and obstruction (Herb McCall - Director of Administrative Services) Two members of Defendant's administration have admitted corrupt activities but have never been prosecuted because of deals with the Government (Michael Sullivan - Director of Office of Contract Compliance, Dewey Clark- Personal Assistant to the Mayor) There was substantial evidence about corrupt activities of an additional member of the Administration who has not been prosecuted (Dewayne Martin - Chief Operating Officer) Five businessmen pled guilty to their involvement in corrupt activities with the City during Defendant's administration (Vertis McManus, Sam Barber, Michael Childs, George Greene, and Ronnie Thornton) An additional businessman admitted paying bribes to Defendant but was never charged because of a deal with the Government (Dan DeBardelaben)

23

("As we understand the basis for the District Court's decision, the Court held that, the defendant's net charitable and civic contributions–taking into account both the good and bad that he did in his capacity as a member of the clergy–cannot be considered as so extraordinarily positive as to warrant a downward departure. We agree with this analysis . . ."). Viewed as a whole, Defendant's actions during his tenure as Mayor fall short of the extraordinary public service necessary to justify a departure from the guideline range. The Court declines to downwardly depart based on Defendant's good works.

## 8.   Guidelines Findings

In light of the foregoing, the total offense level applicable to this case is nineteen (19)

### CONSIDERATIONS UNDER 18 U.S.C. § 3553(a)

After the Court determined the applicable guideline range, the Court heard argument from counsel concerning the application of factors under 18 U.S.C. § 3553.[6] The Court considered all of the factors under § 3353 but

---

[6] The factors under 18 U S C  § 3553(a) include the following·

 (1) The nature and circumstances of the offense and the history and characteristics of the Defendant,

24

discusses below those factors of particular importance.

Based upon a consideration of the § 3553 factors, the Court concludes

that a thirty (30) month sentence is appropriate in this case. From the day the

jury found Defendant guilty of the income tax charges, he has sought to

minimize his crimes. After publicly proclaiming during the trial that he had as

much as $20,000 per year in poker winnings, Defendant declared on the day

that the verdict was rendered, "But, if you look at the tax charges, they all

involve fairly minor speech income which we actually provided the

information for when I filed my disclosure statements." (See Gov't Sentencing

---

(2) The need for the sentence imposed - (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct, (C) to protect the public from further crimes of the Defendant, and (D) to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) The kinds of sentences available; ..

(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and

(7) The need to provide restitution to any victims of the offense.

18 U S C § 3553(a)   See United States v Thomas, 446 F 3d 1348, 1356 (11th Cir 2006)

Mem. [362] at Ex A.) He also stated, "But, the charges really are about my speech income that was not reported." (Id.) Defendant also sought to minimize his culpability for the crimes. For example, Defendant has stated, "I think we said from the very outset that I had a fairly poor recordkeeping in terms of my speeches." (Id.) When asked what he would do differently, Defendant responded, "I'd have an accountant that would probably pay more attention to the manner in which I was preparing and filing my income taxes. Look, it is very difficult as Mayor, as a father, as a husband, making certain that you do all the things that are required, trying to keep track of all the paperwork. It is just an oversight. And, I think you heard testimony that was unrefuted that I was a sloppy recordkeeper, and so there is no doubt about that and, of course, I'll have to deal with that issue as we go forward." (Id.)

The evidence in the case is contrary to Defendant's description of his crime While it is true that some of Defendant's unreported income came from unreported speeches, the bulk of the income came from gambling and/or corrupt payments An appropriate sentence is required to reflect the seriousness of Defendant's failure to report such income

26

The sentence imposed in the case is also important to serve as a deterrent to criminal conduct. Public officials must understand that they are not excused from compliance with the law. Defendant is not entitled to be excused from this criminal conduct because of his position as a public official.

Additionally, the Court is cognizant of sentences imposed upon other defendants who were prosecuted as a part of this same investigation. The Court considered the crimes for which those sentences were imposed as well as other relevant circumstances, such as whether the defendant plead guilty or went to trial, whether the defendant accepted responsibility for his criminal conduct, and whether the defendant agreed to assist the Government in its corruption investigation. The Court also considered sentences that are generally imposed for tax offenses.

Many of the factors that were considered in the Court's review of the Sentencing Guidelines enter into its analysis under § 3553 as a part of the nature and circumstances of the offense. Particularly, the fact that substantial amounts of unreported income arose from criminal activities influences the sentence. Further, the fact that Defendant sought to obstruct the investigation

27

of his criminal activities influences the Court's determination of an appropriate sentence in this case.

The Court has treated the Sentencing Guidelines as advisory in nature. Considering the guidelines and the factors under § 3553, the Court concludes that a sentence of thirty (30) months in the custody of the Bureau of Prisons followed by one (1) year of supervised release, on each count, to be served concurrently, a fine in the amount of $6,000, and a $300 special assessment is appropriate in this case.

**SO ORDERED** this /5ᵗʰ day of June, 2006.

RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

28

## APPENDIX A

.

## Calculations of Net Cash Expenditures[1]

| Description | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|
| Cash Expenditures Gov't Exhibit 1141 | $5,044 50 | $13,752 68 | $19,560 73 | $23,292 90 |
| Charitable Contributions | $4,195 00 | $ 4,750 00 | $ 4,775 00 | $ 4,590 00 |
| The Children's School | | $    100 00 | $ 1,500 00 | |
| Marion Brooks' Gift (Trial Testimony) | | | | $    800 00 |
| Mac & Jac Dry Cleaning | | | | $    356 30 |
| **SUB-TOTAL** | **$9,239 50** | **$18,602.68** | **$28,835 73** | **$29,039 20** |
| Less Sources of Cash (Gov't Exh 1155) | $8,539 43 | $ 1,608 49 | $ 1,974 83 | $      69 00 |
| Less Dewey Clark Rental | $3,600 00 | $ 2,100 00 | $    600 00 | $ 1,500 00 |
| Less Sharon Campbell's Reimbursement Checks | $1,385 42 | $ 1,587 70 | $ 1,124 90 | $ 1,290 80 |
| **NET CASH EXPENDITURES** | **$       00[2]** | **$13,306 49** | **$22,136 00** | **$26,179 40** |

[1]  The format for the calculations of Net Cash Expenditures and Total Unreported Income are taken from pages 26 and 27 of the PSI

[2]  The expenditures in the chart are not all of Defendant's cash expenditures  Therefore, in 1996, when the sources of cash exceed the *identified* expenditures, the Court simply attributes no net cash expenditures to Defendant for that year

1

**APPENDIX B**

**Calculation of Total Unreported Income**

| DESCRIPTION | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|---|
| Net Cash Expenditures | | | | $13,306 49 | $22,136 00 | $26,179 40 | | |
| Unreported Speaking Fees | | | $14,322 00 | $ 9,500 00 | $17,000.00 | | | |
| Rental Income (Dewey Clark Testimony) | $3,600 00 | $3,600 00 | $ 3,600 00 | $ 2,100 00 | $ 600 00 | $ 1,500 00 | | |
| World Series Ticket Income | | | $ 2,000 00 | | | | | |
| Campaign Payments for Personal Expenses | | | | | | | | |
| Travel/Credit Card Expenses | | | | | $ 1,658 27 | $ 6,205 72 | $11,614 50 | $10,380 12 |
| Bill Campbell Cell Phone Charges | | | | | $ 9,963 64 | $ 4,875 18 | | |
| Family Member Cell Phone Charges | | | | | $ 2,317 88 | $ 2,847 89 | $  493 71 | |
| **Unreported Income** | $3,600 00 | $3,600 00 | $19,922 00 | $24,906 49 | $53,675 79 | $41,608 19 | $12,108 21 | $10,380 12 |

11